UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| FREEDOM FRANCHISE SYSTEMS, LLC, | ) | |
|---|---|---|
| | ) | Case No. 3:22-cv-135 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| CHOTO BOAT CLUB, LLC, and | ) | |
| CAREFREE BOAT CLUB NETWORK, LLC, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Before the Court is Freedom Franchise Systems, LLC's ("Freedom") motion for temporary restraining order (Doc. 7). For the following reasons, the motion is **GRANTED**.

### I. BACKGROUND

Freedom is a limited-liability company that sells boat franchises to individuals and companies interested in operating boat clubs throughout the nation.[1] (Doc. 1, at 3.) Founded in 1989, Freedom has, over the years, developed intellectual property, analytical methods, know-how, and skills[2] that it provides to its franchisees to successfully operate a Freedom Boat Club. (*Id.*) In 2006, Freedom entered into a franchise agreement ("the Franchise Agreement") with Volunteer Boat Club LLC ("Volunteer"), owned by Mitchell Jones, to operate a Freedom Boat

---

[1] All facts are taken from allegations in the verified complaint. (Doc. 1.) Keith Van Horn has sworn to these allegations. (*Id.* at 22.)

[2] The verified complaint does not identify this information with additional specificity.

Club through the Choto Marina in Knoxville, Tennessee. (*Id*. at 3–4.) The Franchise Agreement was renewed in 2017 for a five-year term, to expire in May 2022. (*Id*. at 3.)

The Franchise Agreement assigned certain ownership rights to Freedom, including customer data collected by Volunteer. (*Id*. at 4; Doc. 1-2, at 16.) Additionally, the Franchise Agreement identified certain information as proprietary and confidential: "the marketing methods, product analysis and selection, service methods, skills relating to the developing and operation of a Freedom Boat Business, know-how, techniques, information, and trade practices." (Doc. 1, at 4; Doc. 1-2, at 31.) The Franchise Agreement provides, in relevant part,

> Franchisee further agrees that Franchisee:
>
> 1. will not use the Confidential information in any other business or capacity;
>
> 2. will maintain the absolute confidentiality of the Confidential information during and after the term of this Franchise Agreement;
>
> 3. will not make unauthorized copies of any portion of the Confidential Information disclosed in any form including, but not limited to: electronic media, written form, or other tangible forms; and
>
> 4. will adopt and implement all reasonable procedures prescribed by Franchisor, from time to time, to prevent unauthorized use and/or disclosure of the Confidential Information, including restrictions on disclosure to employees and the use of nondisclosure and non-competition agreements that Franchisor may prescribe for persons having access to the Confidential Information.
>
> . . .
>
> Under the Franchise Agreement, we will provide Franchisee with specialized training, proprietary trade secrets, and other Confidential information relating to the establishment and operation of a franchised business. The provisions of the Franchise Agreement governing Franchisee's non-disclosure obligations relating to our Confidential Information are hereby incorporated into this Owners Agreement by reference, and Owners agree to comply with each obligation as though fully set forth in this Owners Agreement as a direct and primary obligation of Owners. Further, we may seek the same remedies against Owners under this Owners Agreement as we may seek against Franchisee under the Franchise Agreement. Any and all information, knowledge, know-how, techniques, and

2

other data, which we designate as confidential, will also be deemed Confidential
Information for purposes of this Owners Agreement

The Franchise Agreement also contained a two-year noncompete clause, as well as a clause creating a right of first refusal for any assignment or transfer of the Volunteer franchise agreement. (Doc. 1, at 5–6; Doc. 1-2, at 26–29, 33, 56.)

In April 2021, Choto Marina, where Volunteer operated its Freedom franchise, was sold and its operation transferred to Choto Marina LLC ("Choto LLC"). (Doc. 1, at 5; Doc. 1-3.) Choto LLC's ownership includes Justin Church. (Doc. 1, at 5; Doc. 1-3.) Jones, who continued to operate Volunteer, told Freedom that the sale of the marina had no impact on its ability to operate, but requested that Church and his wife, Shannon Church, be trained on the Freedom systems and that Church be identified as the new franchise manager. (Doc. 1, at 6.)

Pursuant to Freedom's policies, individuals with certain management responsibilities at Freedom-franchised clubs were required to execute Freedom's System Protection Agreement ("Protection Agreement").[3] (*Id*. at 6.) Choto LLC and Church did not execute the Protection

---

[3] The Protection Agreement contains the following terms:

> **Know-How and Intellectual Property.** You agree: (i) you will not use the Know-how in any business or capacity other than the Freedom Boat Club business operated by Franchisee; (ii) you will maintain the confidentiality of the Know-how at all times; (iii) you will not make unauthorized copies of documents containing any Know-how; (iv) you will take such reasonable steps as we may ask of you from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you will stop using the Know-how immediately if you are no longer a manager or officer of Franchisee's Freedom Boat Club business. You further agree that you will not use all or part of the Intellectual Property or all or part of the System for any purpose other than the performance of your duties for Franchisee and within the scope of your employment or other engagement with Franchisee. These restrictions on Know-how, Intellectual Property and the System shall not apply to any information which is information publicly known or becomes lawfully known in the public domain other than through a breach of this Agreement or is required or compelled by law to be disclosed, provided that you

Agreement, despite Freedom's requests that they do so, and Freedom did not consent to them accessing its proprietary information. (*Id*.)

Prior to April 2022, no substantial changes were made to Volunteer's operations other than a bank change for royalty payments, which was executed by Jones. (*Id*. at 7.) After Freedom's representatives visited the club to evaluate whether it would renew its Franchise Agreement in May, however, it received a "Notice of Early Termination" from Choto and Volunteer. (*Id*.) Freedom alleges that Choto improperly obtained its proprietary customer information and social-media accounts with names like "@KnoxvilleFreedomBoatClub and @FBCKnoxville" to try and solicit Freedom's customers and make it seem as if Choto's new boat club, Carefree, was operated by Freedom. (*Id*. at 8.) Furthermore, Freedom implies that Jones gave Church and Choto LLC access to the customer lists. (*Id*.) Freedom states that Choto is reaching out to Freedom customers and directing them to pay Choto directly. (*Id*.; Doc. 1-5.) Finally, Freedom's reservation system was hacked and customer data was replaced with profane

---

> will give reasonable notice to us to allow us to seek protective or other court orders.
>
> **Unfair Competition During Relationship.** You agree not to unfairly compete with us at any time while you are a manager or officer of Franchisee's Freedom Boat Club business by engaging in any Prohibited Activities.

(Doc. 1-4, at 2.) The Protection Agreement defines "Prohibited Activities" as

> *"Prohibited Activities"* means any or all of the following: (i) owning, operating, or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent, or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly-traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing or attempting to induce: (a) any customer of ours (or of one of our affiliates or franchisees) to transfer their business to you or to any other person that is not then a franchisee of ours.

(*Id*. at 1.)

language. (Doc. 1, at 8; Doc. 1-6.) This reservation system is visible to all of Freedom's customers and franchisees. (Doc. 1, at 8.) Freedom alleges that Choto is responsible for the hack. (*Id*. at 9.)

Freedom filed its verified complaint on April 14, 2022, asserting claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*., and the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701, *et seq*., in addition to state-law claims of tortious interference with business relationships, tortious interference with contract, unfair competition, civil conspiracy, unjust enrichment, and conversion. (*See* Doc. 1.) On April 15, 2022, Freedom filed the instant motion for a temporary restraining order (Doc. 7).

## II. STANDARD OF REVIEW

The purpose of a temporary restraining order ("TRO") is to preserve and maintain the status quo for a very short period of time "so that a reasoned resolution of a dispute may be had." *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). The Court may only issue a temporary restraining order without written or oral notice to the adverse party or his attorney where the party seeking the TRO demonstrates it has fulfilled the following requirements:

    (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

    (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). The Court must also require the movant to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Further, "ex parte restraining orders should be limited to preserving the status quo only for so long as is necessary

to hold a hearing." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974)); *see Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705, 710 (E.D. Mich. 2006) ("A temporary restraining order is an extraordinary remedy that generally is reserved for emergent situations in which a party may suffer irreparable harm during the time required to give notice to the opposite party or where notice itself may precipitate the harm").

When reviewing motions for TROs, courts must consider the following: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Am. Imaging Servs., Inc. v. Eagle-Picher Indus.*, Inc., 963 F.2d 855, 858 (6th Cir. 1992)); *see also Midwest Retailer Associated, Ltd. v. City of Toledo*, 563 F. Supp. 2d 796, 802 (N.D. Ohio 2008) ("The same standard generally applies to the issuance of temporary restraining orders and preliminary injunctions."). These considerations are "factors to be balanced and not prerequisites that must each be satisfied" before relief may issue. *Eagle-Picher*, 963 F.2d at 859. Nor are they "rigid and unbending requirements"; rather, "[t]hese factors simply guide the discretion of the court." *Id*. The party seeking injunctive relief bears the burden of justifying such relief. *Id*.

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

##### i. Trade-Secrets Claims

For a misappropriation-of-trade-secrets claim under TUTSA, a plaintiff must establish: (1) the existence of a trade secret, (2) misappropriation of the trade secret by the defendant, and

(3) detriment to the plaintiff. *See Hickory Specialties, Inc. v. B&L Lab, Inc.*, 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979). TUTSA defines "trade secret" as

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> > (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). "Several factors are relevant to determining whether information falls within this statutory definition, including the extent of public knowledge; measures taken to guard its secrecy; the value of the information both to the business and to its competitors; money that was spent to develop the information; and the ease or difficulty with which it could be acquired by outsiders." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 961 (M.D. Tenn. 2011) (quoting *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973 (6th Cir. 2007)); *see also Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 588 (Tenn. Ct. App. 2001).

"TUTSA's definition of trade secret "is sufficiently broad to include information which at common law would have been considered confidential information."" *Knox Trailers, Inc. v. Maples*, --- F. Supp. 3d ---, 2022 WL 248093, at *6 (E.D. Tenn. Jan. 25, 2022). Customer information may, in certain circumstances, constitute a trade secret. *See id.*; *see also Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *15 (Tenn. Ct. App. 2010) ("[E]ven if the information could have been developed by independent means, it may be protectible if the former employee does not develop it by independent [means] but in fact

7

Case 3:22-cv-00135-TRM-DCP   Document 9   Filed 04/15/22   Page 7 of 12   PageID #: 138

obtains his knowledge . . . from his former employer and then uses this knowledge to compete with the former employer." (internal quotation marks omitted)).

Freedom has demonstrated that it took substantial steps to safeguard its proprietary and confidential information, such as its marketing methods, customer lists, know-how, and intellectual property. Franchisees of Freedom were required to sign the Franchise Agreement, which stated that customer information would be the sole property of Freedom and that confidential information was to be safeguarded and not to be used to compete with Freedom. (*See* Doc. 1.) Furthermore, individuals with access to Freedom's confidential and proprietary information were supposed to sign the Protection Agreement, which bound them to similar terms of use as franchisees and protected Freedom's information. (*See* Doc. 1-4.)

Customer lists would be useful to Freedom's competitors, because it would enable them to solicit Freedom's customers and provide similar experiences. Additionally, this information would be difficult to independently obtain, as it was housed in a database with limited access and contractually protected. As a result, the Court concludes that Freedom has demonstrated that it likely possessed trade secrets in its customer lists.[4]

The second element of a misappropriation-of-trade-secrets claim is misappropriation. TUTSA defines misappropriation as

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

---

[4] The verified complaint does not contain detailed allegations about how Choto LLC acquired the customer lists. Additionally, the verified complaint only discusses trade secrets and confidential information in vague terms. On the face of the verified complaint, it is difficult to determine whether anything other than customer lists constitutes trade-secret information. In order to merit a preliminary injunction, Freedom is expected to provide additional specificity regarding Choto LLC's acquisition of the trade secrets, as well as specific examples of confidential information that was misappropriated.

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i)    Used improper means to acquire knowledge of the trade secret; or

    (ii)    At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:

        (a) Derived from or through a person who had utilized improper means to acquire it;

        (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Tenn. Code Ann. § 47-25-1702(2). To succeed on a misappropriation claim, the defendant must have harmed the plaintiff. *Hickory Specialties*, 592 S.W.2d at 586.

In its verified complaint, Freedom includes allegations that Choto LLC is using its customer lists and information to solicit customers and that Choto LLC knew that Freedom protected its trade-secret information with contracts. (Doc. 1, at 7–9; Doc. 1-5.) Freedom attached to the verified complaint a message from Choto LLC to Volunteer's customers, informing them that their membership had been converted to a Carefree membership, and that they should pay Choto LLC directly. (Doc. 1-5.) Furthermore, Freedom alleges that Choto LLC hacked into its customer database and replaced information with profanity to damage its reputation. (Doc. 1-6.) Accordingly, at this stage, Freedom has made a sufficient showing that Choto LLC and Carefree misappropriated its trade secrets to its detriment. Therefore, Freedom has demonstrated a reasonable likelihood of success on the merits of its trade-secrets claims.

        ***ii.    Intentional Interference with Business Relationships***

To succeed on an intentional-interference-with-business-relationships claim, a plaintiff must establish:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from tortious interference.

*Knox Trailers*, 2022 WL 248093, at *8 (citing *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)). Additionally, the plaintiff must show that the defendant had "improper motive or improper means." *Id.* (quoting *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007)). Improper means include means that are "independently tortious," including misuse of inside or confidential information and unfair competition. *Brown v. Brookdale Senior Living, Inc.*, No. M2011-00540-COA-R3-CV, 2011 WL 6916763, at *4 (Tenn. Ct. App. Dec. 28, 2011).

In this case, Freedom alleges in its verified complaint that Choto LLC, knowing of Volunteer's relationship with Freedom, is using Freedom's confidential information to convert Freedom's franchise rights and thwart its exercise of those rights, such as the right of first refusal. (Doc. 1, at 7.) Choto LLC was sent the Franchise Agreement and knew of its contents, as well of its expiration date. (*Id.*) Freedom alleges that, following its visit to Choto Marina, Volunteer and Choto LLC sent it a Notice of Termination that does not comply with any procedure laid out in the Franchise Agreement. (*Id.*) Furthermore, Choto LLC is alleged to have passed the confidential information on to Carefree to unfairly compete with Freedom. (*Id.* at 8.) Consequently, Freedom has demonstrated Choto LLC knew about Freedom's relationship with Volunteer and sought to induce the breach of such relationship through the improper acquisition

and use of Freedom's trade secrets. Accordingly, Freedom has established a reasonable likelihood of success on its intentional-interference claim.

### B. Irreparable Harm

"The single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Wright & Miller*, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). A preliminary injunction will be denied if the applicant has an adequate remedy at law. *First Nat. Bank & Tr. Co. of Michigan v. Fed. Reserve Bank of Chicago*, 495 F. Supp. 154, 157 (W.D. Mich. 1980).

Freedom has demonstrated that it will suffer irreparable harm if Choto LLC and Carefree are not enjoined from soliciting its customers and using its information. Should customers leave Freedom and go to Carefree and Choto, LLC, Freedom is unlikely to be able to recover such customers. Volunteer's Franchise Agreement is valid until May 2022, too, and Volunteer is likely entitled to payments that it is currently missing if customers are paying Choto LLC directly. Furthermore, if Carefree and Choto LLC are permitted to use Freedom's customer list and other information, Freedom will lose any competitive advantage it acquired through the compilation and guarding of such information. And, calculating the damages of lost customers and lost goodwill would be speculative and difficult. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.") (internal citation omitted). As a result, this factor militates in favor of granting Freedom's motion for a temporary restraining order.

### C. Harm to Others

The Court finds that only Choto LLC and Carefree are likely to be harmed by the injunction. As a result, this factor weighs in neither party's favor.

### D. Public Interest

As reflected by TUTSA and DTSA, the public has an interest in the protection of proprietary and confidential information. Furthermore, the public has an interest in the enforcement of contracts. *Amerigas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993). Consequently, this factor weighs slightly in favor of granting the requested relief.

## IV. CONCLUSION

For the above reasons, Freedom's motion for a temporary restraining order is **GRANTED**. The Court hereby **ORDERS** the following:

1. Defendants may not directly or indirectly solicit, service, deal with, or acquire any accounts, clients, or prospective clients or customers of Freedom;

2. Defendants may not otherwise use or access Freedom's customer lists.

3. Defendants may not collect payments from customers at the Volunteer franchise location at Choto Marina in Knoxville, Tennessee, or direct customers to pay Choto LLC directly instead of paying Freedom.

4. Freedom is hereby **ORDERED** to post a bond amount of $25,000.

A preliminary injunction hearing is **SET** for **April 20, 2022,** at **9:00 a.m.**

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**