UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| FREEDOM FRANCHISE SYSTEMS, LLC, | ) | |
|---|---|---|
| | ) | Case No. 3:22-cv-135 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| CHOTO BOAT CLUB LLC and | ) | |
| CAREFREE BOAT NETWORK, LLC, | ) | |
| | ) | |
| *Defendants*. | | |

**ORDER**

Before the Court is a motion for preliminary injunction filed by Plaintiff Freedom Franchise Systems, LLC ("Freedom") (Doc. 7). For the following reasons, the Court **DENIES** the motion and **DISSOLVES** the temporary restraining order (Doc. 9).

I. BACKGROUND

On April 14, 2022, Freedom filed suit against Choto Boat Club, LLC ("Choto") and Carefree Boat Club Network, LLC ("Carefree"), asserting federal and state trade-secrets claims and various state tort claims. (Doc. 1.) The next day, Freedom filed a motion for a temporary restraining order and preliminary injunction. (Doc. 7.) The Court issued a temporary restraining order after finding that Freedom had demonstrated a likelihood of success on the merits on its trade-secrets claim, and that none of the other factors weighed against injunctive relief. (Doc. 9, at 8–10.) The Court's conclusion was primarily based upon the finding that Freedom had met its burden of establishing that it possessed information entitled to trade-secret protection in its customer data, and that it had further demonstrated Choto was using this data in likely violation

of confidentiality agreements. (*Id.*) Choto subsequently filed a motion to dissolve the temporary restraining order on April 19, 2022, and Carefree responded to Freedom's motion. (Docs. 12–16.) On April 20, 2022, the Court held a hearing to determine whether the temporary restraining order should be converted into a preliminary injunction. The testimony and arguments presented by Freedom at the hearing revealed that the real crux of this dispute concerns the ownership of the customer agreements and whether such agreements constitute trade-secret information.

Freedom is a boat-club franchising company that has over 350 franchise locations nationwide. Keith van Horn, one of Freedom's franchise development managers, testified that, in April 2021, he was made aware of Volunteer's—Freedom's franchisee operating in Knoxville and owned by Mitchell Jones—intention to sell its assets to Choto. In an e-mail sent by Jones to van Horn, Jones stated that nothing would change in Volunteer's operations except that Justin Church, the owner of Choto, would manage Volunteer's franchise. (*See also* Ex. 4.) Van Horn testified that for about a year, everything continued as usual, and Freedom began to engage Church in discussions for Choto to become the bona fide Freedom franchisee in Knoxville. Freedom requested that Church, as a manager of Volunteer, sign its "Systems Protection Agreement," which contained a noncompete clause. Church testified that, on the advice of counsel, he never executed the agreement.

As part of these discussions, Church sent van Horn sample membership agreements (to be executed between Choto and the member) as well as sample rules and regulations. Van Horn testified that these documents worried him for two reasons: (1) the membership agreement was between Choto and the member, while Volunteer was the present franchisee, and reserved the right to move to a different reservation platform if necessary, and (2) the rules and regulations appeared to have been taken from the Freedom template and minimally modified.

According to van Horn, the customer agreements themselves—meaning the contractual relationship and not merely the form of the written agreements—belong to Freedom pursuant to the terms of the Franchise Agreement, which provides, in relevant part,

> It is expressly agreed that the ownership of all of the Confidential Information is and shall remain vested solely in Franchisor, and *that all customer lists and associated data and information obtained in the first instance by Franchisee is and shall be the exclusive property of Franchisor*.

(Ex. 5, at B29–30) (emphasis added). Van Horn testified that "associated data" includes customers' names, addresses, phone numbers, emails, type of membership plan, members' reservation patterns, in addition to the membership agreements themselves. When asked, however, if Freedom considers customers' names to be confidential information, van Horn equivocated. Additionally, during cross-examination, van Horn acknowledged that individual franchises execute these membership agreements with their members. Freedom is not a party to these agreements, nor does Freedom collect payments directly from members. Instead, the franchisee remits royalty payments to Freedom. Van Horn's understanding is consistent with the Franchise Agreement, but it is inconsistent with Freedom's legal theory—that the Franchise Agreement somehow converts a franchisee's customer relationships into Freedom's property.

During the hearing, Church testified that he bought all of Volunteer's assets, including its boats, the marina, and, according to him, the membership agreements, in April 2021.[1] Church testified that Volunteer and Choto have always maintained their own customer lists, including customers' names, emails, and payment information, and that they never shared this information

---

[1] Alan Patrick, the Chief Information Officer of Brunswick Corporation (Freedom's parent company) also testified about ongoing issues with Choto's online presence. These issues appear to be in the process of being resolved; however, if they are not promptly resolved, the Court will entertain another motion.

with Freedom, or Carefree.  Choto's business at the marina encompasses much more than just the boat-sharing relevant to Freedom.

In March 2022, Jones, allegedly on behalf of Choto, sent Freedom a purported termination notice, letting it know that it would be ending its relationship with Freedom.  (Ex. 12.)  Freedom subsequently sent its own termination notice.  Van Horn testified that Freedom had secured another franchisee in the Knoxville area in lieu of trying to salvage the relationship with Choto.  However, there is no evidence that Freedom can presently service the demands of the customers with agreements with Volunteer or Choto.

## II. STANDARD OF LAW

The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  When reviewing motions for preliminary injunctions, Courts must balance the following factors:  (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction.  *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).  "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction."  *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).  They are not "rigid and unbending requirements"; rather, they "simply guide the discretion of the court."  *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).  The party seeking injunctive relief bears the burden of justifying such relief.  *Id*.

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

Freedom's request for a preliminary injunction relies on its trade-secrets and intentional-interference-with-business-relationship claims. (Doc. 8, at 8–11.) For a misappropriation-of-trade-secrets claim under the Tennessee Uniform Trade Secrets Act ("TUTSA"), a plaintiff must establish: (1) the existence of a trade secret, (2) misappropriation of the trade secret by the defendant, and (3) detriment to the plaintiff. *See Hickory Specialties, Inc. v. B&L Lab, Inc.*, 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979). TUTSA defines "trade secret" as

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). "Several factors are relevant to determining whether information falls within this statutory definition, including the extent of public knowledge; measures taken to guard its secrecy; the value of the information both to the business and to its competitors; money that was spent to develop the information; and the ease or difficulty with which it could be acquired by outsiders." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 961 (M.D. Tenn. 2011) (quoting *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973 (6th Cir. 2007)); *see also Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 588 (Tenn. Ct. App. 2001).

"TUTSA's definition of trade secret is sufficiently broad to include information which at common law would have been considered confidential information." *Knox Trailers, Inc. v. Maples*, --- F. Supp. 3d ---, 2022 WL 248093, at *6 (E.D. Tenn. Jan. 25, 2022) (internal quotation omitted). Customer information may, in certain circumstances, constitute a trade secret. *See id.*; *see also Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *15 (Tenn. Ct. App. 2010) ("[E]ven if the information could have been developed by independent means, it may be protectible if the former employee does not develop it by independent [means] but in fact obtains his knowledge . . . from his former employer and then uses this knowledge to compete with the former employer." (internal quotation marks omitted)).

While the Court previously found that Freedom demonstrated a likelihood of success on its trade-secrets claim, with the benefit of the hearing, it is clear that there are significant issues with Freedom's position. First, membership contracts between Volunteer (or Choto) and members are unlikely to be considered trade secrets under TUTSA. These contracts, by their very nature, are designed to be shared with an outside party: the member. Furthermore, the "Welcome Packet" from Choto including the membership agreement does not contain any confidentiality provisions that would indicate a substantial effort to keep such information private. (Ex. 6.) As for the rest of Freedom's customer information—such as names and addresses—van Horn himself refused to confirm that Freedom considered such information to be a trade secret. *See also HCTec Partners, LLC v. Crawford*, No. M2020-01373-COA-R3-CV, 2022 WL 554288, at *10 (Tenn. Ct. App. Feb. 24, 2022) ("Because customer identities are not secret, they cannot be considered confidential" (quoting *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 645 (Tenn. Ct. App. 1999)). And, in this case, there is no proprietary pricing information

6

owned by Freedom, either, as Church and van Horn both testified that franchisees set their own pricing. While there may be some overlap between protected and non-protected data, the barely-protectable nature of the data at issue reduces the likelihood that Freedom will prevail.

Second, it is far from clear that Freedom possesses ownership rights in the membership agreements. The Franchise Agreement assigns Freedom property rights in "all customer lists and associated data and information," but says nothing about membership agreements. (Ex. 5, at B29–30.) Furthermore, nothing in the membership agreements designates Freedom as a third-party beneficiary, and Freedom is not a party to these contracts. Consequently, Freedom has not demonstrated that it is likely Choto misappropriated any of Freedom's trade secrets by servicing Volunteer's customers or entering agreements with them. As a result, Freedom has not demonstrated a sufficient likelihood of success on the merits of its trade-secrets claim to merit preliminary injunctive relief.

Freedom has also failed to demonstrate a likelihood of success on its intentional-interference-with-business-relationships claim sufficient to warrant preliminary-injunctive relief. To succeed on an intentional-interference-with-business-relationships claim, a plaintiff must establish:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from tortious interference.

*Knox Trailers*, 2022 WL 248093, at *8 (citing *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)). Additionally, the plaintiff must show that the defendant had "improper motive or improper means." *Id*. (quoting *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007)). Improper means include means that

are "independently tortious," including misuse of inside or confidential information and unfair competition. *Brown v. Brookdale Senior Living, Inc.*, No. M2011-00540-COA-R3-CV, 2011 WL 6916763, at *4 (Tenn. Ct. App. Dec. 28, 2011).

At the hearing, van Horn testified that Freedom is not a party to the membership agreements and that it also sent a termination notice to Volunteer and Choto. Because the membership contracts appear to exist between Choto and the member, without Freedom's involvement, there is no contract involving Freedom in which Choto would have tortiously interfered. The contractual relationship is between Volunteer, as franchisee, and Freedom, as franchisor. While Freedom may have a valid intentional-interference claim regarding the termination notice sent by Volunteer, given that Freedom subsequently sent Volunteer a reciprocal (and, presumably, operative) termination notice, the Court cannot find at this time that Freedom is likely to succeed on the merits of its claim.

### B. Irreparable Harm

"The single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Wright & Miller*, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). A preliminary injunction will be denied if the applicant has an adequate remedy at law. *First Nat. Bank and Tr. Co. of Michigan v. Federal Reserve Bank of Chicago*, 495 F. Supp. 154, 157 (W.D. Mich. 1980).

In this case, Freedom has not demonstrated that its injury will not be compensable with damages. Indeed, at this point, it appears that Freedom does not even have the capacity to service members in the Knoxville area, and the remedy it seeks would destroy the value of the

customer base, not protect it until a trial on the merits. As a result, this factor weighs against the issuance of a preliminary injunction.

### C. Harm to Others

The Court initially found that there would not be substantial harm to others when analyzing Freedom's request for the temporary restraining order. After the preliminary-injunction hearing, however, the Court concludes that Choto's members will be substantially harmed if Choto is enjoined from operating. The summer boating season is rapidly approaching, and boat-club members have already paid their dues and expect to be able to use Choto's services. Furthermore, van Horn testified at the hearing that Freedom is not presently able to service these members. Consequently, if the Court issued preliminary-injunctive relief, Choto's members would be left high and dry, and the economic value over which the parties are arguing would be harmed. Accordingly, this factor weighs against issuing a preliminary injunction.

### D. Public Interest

A preliminary injunction, and the final disposition of this dispute, is unlikely to have an effect on the public interest. Consequently, this factor weighs neither in favor nor against granting preliminary-injunctive relief.

## IV. CONCLUSION

For the foregoing reasons, Freedom's motion for a preliminary injunction (Doc. 7) is **DENIED** and the temporary restraining order (Doc. 9) is **DISSOLVED**. An expedited schedule is necessary in this matter because: (1) this dispute primarily implicates legal questions of contract interpretation that can be resolved by the Court; (2) while some facts are disputed, the parties are in agreement about the core facts of the case; (3) even though the Court is not granting Freedom's motion for preliminary injunctive relief, the parties and Choto's customers

have an interest in the quick resolution of this matter. Fed. R. Civ. P. 16(b). Accordingly, the Court **ORDERS** the following schedule:

1. ***Discovery Conference:*** A discovery conference shall be held with Magistrate Judge Debra C. Poplin on **April 25, 2022**, at a time to be set by Magistrate Judge Poplin. Each party shall be prepared to describe what discovery it will request and opposing counsel may make objections at this time. Magistrate Judge Poplin will make discovery rulings at this time.

2. ***Discovery***: All materials shall be produced by **May 2, 2022**.

3. ***Expert Testimony***: Disclosure of any expert testimony any party seeks to use to shall be made on or before **May 9, 2022,** in accordance with Rules 26(a)(2)(B) and 26(a)(2)(C) of the Federal Rules of Civil Procedure.

4. ***Dispositive and Daubert Motions***: The parties will discuss dispositive motions at the final pretrial conference on **May 13, 2022**. The parties shall confer and submit a joint proposal for jury instructions on or before **the same date**. Before submitting the joint proposal to the Court, the parties must attempt to resolve any disagreements. To the extent there are disagreements as to specific instructions that cannot be resolved, the parties should provide competing instructions in their joint proposal. All jury instructions in the joint proposal, including agreed instructions and competing instructions, shall be supported by citations of authority pursuant to Local Rule 7.4. A copy of the proposed jury instructions should be sent to **mcdonough_chambers@tned.uscourts.gov**.

5. ***Final Pretrial Conference***: A final pretrial conference will be held in Courtroom 3 on **May 13, 2022**, at **3:00 p.m.** at the U. S. Courthouse, 900 Georgia Avenue, Chattanooga, Tennessee. The parties shall prepare and submit a final pretrial order to the Court on or before the date of the final pretrial conference. A sample copy of the final pretrial order is located on the district court's web page at **http://www.tned.uscourts.gov**. The parties shall file trial briefs on anticipated evidentiary and legal issues at least three business days before the Final Pretrial Conference. Prior to the final pretrial conference, the parties shall file an exhibit list and provide the Court with exhibits pre-marked for identification purposes. The parties shall be prepared to discuss the admissibility of such exhibits at the final pretrial conference.

6. ***Trial***: The trial of this case will be held in Chattanooga before the United States District Judge **and a jury** beginning on **May 16, 2022**, at **9:00 a.m.** If this case is not heard immediately, it will be held in line until the following day or anytime during the week of the scheduled trial date. **SHOULD THE SCHEDULED TRIAL DATE CHANGE FOR ANY REASON, THE OTHER DATES CONTAINED IN THIS ORDER SHALL REMAIN AS SCHEDULED. SHOULD THE PARTIES DESIRE A CHANGE IN ANY OF THE OTHER DATES, THEY SHOULD NOTIFY THE**

**COURT AND SEEK AN ORDER CHANGING THOSE DATES.**[2]

**SO ORDERED.**

                                         /s/ *Travis R. McDonough*
                                         **TRAVIS R. MCDONOUGH**
                                         **UNITED STATES DISTRICT JUDGE**

---

[2] The demands of the Court's docket dictate that all trials, including all pretrial hearings, in civil cases be conducted in Chattanooga, Tennessee. The Court will, however, entertain motions to conduct trial in another division of this Court upon a showing of good cause by the parties. Any such motions must be filed **after the dispositive motions deadline but no later than four weeks before the final pretrial conference**, and the grant or denial of the same rests in the Court's discretion.